UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN JACOB,

            Plaintiff,                                    Case No. 05-72213

vs.

                                                          HONORABLE PAUL D. BORMAN
JO ANNE B. BARNHART,                                      HONORABLE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,                          MAGISTRATE JUDGE

            Defendant.
_____/


## REPORT AND RECOMMENDATION

### I.    BACKGROUND

John Jacob brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits under Title II of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

### A.    Procedural History

Plaintiff originally filed an application for DIB on February 16, 1999, alleging disability since July 31, 1992, due to "Gulf War syndrome, i.e. (sinus throat and lung infections)"; migraine headaches with seizures, vomiting, cramping, nausea and photosensitivity; arthritis in hands, shoulders, back, ankles and knees; memory loss; sleep disorder; chronic fatigue and almost constant diarrhea (R. 66, 71). This claim was denied on September 29, 2000, after a hearing by Administrative Law Judge (ALJ) Henry Perez Jr. (R. 465-

1

475).  The Appeals Councils remanded the matter for a second hearing before ALJ Perez, who again denied

the claim on June 27, 2002 (R. 548-558).  The Appeals Council remanded the matter for a third hearing

which took place before ALJ Michael Wilenkin.  The Appeals Council mandated that the ALJ ascertain the

length of treatment and the weight to be accorded to certain of Plaintiff's treators, Dr. Kenneth Israel and

Andrea Thomas, M.A., and evaluate Plaintiff's subjective complaints in accordance with 20 C.F.R. §

404.1529 (R. 581-82).  On August 17, 2004, ALJ Wilenkin denied the claim following the third hearing, on

May 20, 2004, (R. 23).  The Appeals Council denied Plaintiff's request for review of this decision on April

1, 2005 (R. 12-14).

      **B.**    **Background Facts**

           *1.*    ***Plaintiff's Hearing Testimony***

Plaintiff was born on April 16, 1963 (R. 747).  He has an associates degree in heavy equipment

technology (R. 758-59).  His past employment included mechanic, babysitting, carpentry and military

recovery specialist (R. 759).

Plaintiff explained that he stopped working in 1992 due to chemical sensitivities, migraine headaches

and seizures (R. 760).  These symptoms started after he had been exposed to chemicals during a road march

in Iraq or Saudia Arabia (R. 760-61, 762).  He received an EEG and medication for the seizures 5 or 6

months later, but could not recall the frequency of his seizures (R. 765).  He continued to have seizures with

the medication and the side effects from the medication made him "useless" and led to his medical discharge

from the armed forces in the summer of 1992 (R. 765-66).  He had seizures 2-3 times per week at the time

of the hearing, which he considered "a bit more under control" with his current medication (R. 767, 768).

He was not aware of what happened during his seizures but relayed a description that had been given to him

of his body becoming rigid and convulsing and then mumbling and rapid eye movement.  He also had

"staring seizures" wherein he sat and stared losing track of time (R. 786). He was able to function through these staring seizures, but they caused loss of time and memory.

He had "bad migraine" headaches which he was able to control with medication if he took the medication right at the onset, though there were times when nothing could be done and the headache would last for long periods of time (R. 769-70). The headaches came with nausea and vomiting (R. 770). Plaintiff had tried a number of medications that did provide relief, but his current medication, Darvon, was successful if he could take it at the onset of the headache (R. 769, 771). The longest period of time Plaintiff had gone without a headache was 5-7 days (R. 771). He had seen a headache specialist at Henry Ford's Headache Center, but stopped going when his doctor left the practice (R. 772).

Plaintiff had recurring diarrhea for five years, but it was cured with Prilosec (R. 773). He had sciatica with lower back pain and leg numbness which had been "pretty much" cured by surgery, but could be aggravated with overwork (R. 780-81). He also experienced fatigue and lack of sleep due to sleep apnea and restless leg disorder, which were diagnosed in 1994 (R. 773). He was prescribed a CPAP machine and had surgery to reduce the number of apneas, but stated that he still had a number of apneas. Plaintiff stated that he would fall asleep during activities 2-3 times per week and described falling asleep during a telephone conversations and cooking (R. 775).

Plaintiff experienced depression since his Gulf War service, with symptoms of lack of energy, crying (a couple of times per week), flashbacks, night sweats and night terrors (R. 776). He had become short-tempered and impatient. He had received treatment for his depression at Henry Ford with a counselor for the Epilepsy Foundation for 2 years starting in late 1999 or early 2000, but had not been back since his wife had started to attend school (R. 778, 780). He took Paxil for the depression, which helped, and was also taking Wellbutrin (R. 779).

3

He had joint pain in his wrists, fingers, elbows and shoulders 2 days per week (R. 783). His hands would cramp up and become weak, preventing him from holding a sheet of paper. His wrist would "pop, like it's been dislocated" when he tried to turn something. He had been told that there was nothing that could be done for him because he did not have rheumatoid arthritis and he was already using Darvon which was "the best medication" (R. 784).

He woke up every hour to hour and a half during the night (R. 784).

Plaintiff was advised to lose weight, but felt that he was unable to do so because he could not exercise and could only walk for 15-20 minutes at a time (R. 774). He no longer drove a car due to fear of seizures. He smoked ½ a pack of cigarettes per day (R. 758). He could do 2 loads of laundry a day, stand 15-20 minutes, lift 10-15 pounds, 30-45 minutes without supporting himself on his elbows (R. 781-82). He could stoop, squat and kneel provided he had support to maintain his balance, but could not bend at the waist to touch his toes (R. 782). He could climb one flight of stairs. Plaintiff could take care of his personal needs on "good days" but not on "bad days" (R. 784). He testified that he sometimes was not able to bathe for a week due to either seizures of lack of desire (R. 785). He completed household chores when he was able. He took care of his daughters, ages 10 and 7, after school, but this amounted to being in the house when they got home (R. 788-89).

### 2.    *Medical Evidence*

Plaintiff alleged disability due to Gulf War Syndrome, migraine headaches, seizures, arthritis, fatigue, and memory loss. He alleged multiple chemical sensitivities, and describe having been exposed to chemicals during the Gulf War (R. 176, 194, 208, 374, 759-64). The extensive administrative record contains considerable evidence concerning Plaintiff's various complaints and medical impairments. The ALJ's decision contains a detailed presentation of the medical evidence (R. 24-29) which will not be repeated here.

4

A brief summary of the records follows.

Headaches

Plaintiff began complaining of headaches while on active duty in 1991 (R. 395-435).  Plaintiff was treated for a 3-day migraine on August 7, 1991 (R.433) and, although there were reports that his migraines were improving in 1991 (R. 426, 427,449), Plaintiff received a medical discharge due to migraine headaches in March 1992 (R. 403-405).  On October 19, 1992, Plaintiff reported experiencing a headache on a daily basis, with more severe migraines with syncope and seizure-type activity occurring 1-2 times per week and lasting up to 3 days (R. 463).  At that time he was not taking any medication for his migraines (R. 462).  The examining physician, N. Weschler, M.D., felt the Plaintiff's disability due to migraine headache was "neurologically minimal" (R. 463).  In 1994, Plaintiff was treated for headaches which were possibly related to his service in the Gulf War (R. 169, 174, 176, 357-59).  He also reported migraine headaches in 1995 and 1996 (R. 184, 195, 202, 241, 245).  On May 23, 1996, Plaintiff reported that he had a constant mild headache and severe migraines every 2-3 weeks lasting 2-3 days to 2-3 weeks (R. 245).  He also reported a history of migraine headaches at a March 16, 1999, psychological exam (R. 339) and a April 22,1999, exam related to seizures (R. 333).  1994 and 1995 MRI examinations were essentially normal apart from a cysts of no clinical significance, and a June 2001 CAT scan yielded negative results (R. 208, 228, 384, 521).

Seizures

*Pre-DLI*

On November 12, 1998, Plaintiff complained of experiencing possible seizures, which the treating physician opined could be partial complex and related to over-medication for restless leg syndrome (R. 264). Plaintiff was unwilling to lower the dose of this medication.  On April 21,1999, Plaintiff was treated subsequent to an episode of 2 seizures (R. 333).  Plaintiff repeated his history of petit mal and grand mal

5

seizures occurring every few days for 8 years to Dr. Gennaoui, a Michigan Department of Disability Services (DDS) consultant, but denied headaches or dizziness during a May 1999 consultative examination (R. 309). Despite a normal physical examination, noting only mild tenderness and decreased range of motion in his joints, Dr. Gennaoui opined that Plaintiff's asthma, seizures and joint pain prevented him from driving or working (R. 312).

*Post-DLI*

1999 and 2000 treatment notes describe complaints of seizures, but EEG testing performed in May and November 1999 yielded essentially normal results (R. 319, 327-33, 367-69, 378), including a November 30, 1999, eight-hour EEG study which revealed no epileptic activity (R. 378).

During a December 15, 1999, neuropsychological assessment at Henry Ford Behavioral Health Plaintiff reported that he had been experiencing seizures for 1 year, and further reported a decrease in seizure activity with staring type episodes happening twice weekly (R. 363). On January 24, 2000, Plaintiff reported to Dr. Gregory Barkley that he experienced seizures 3-5 times per week and staring episodes multiple times each day (R.374, 375). Dr. Barkley opined that Plaintiff had post-traumatic stress disorder giving rise to multiple somatic complaints" (R. 376). Dr. Barkley wished to repeat an EEG to determine if the seizures were epileptic. A March 13, 2000, brain MRI was essentially negative but for mucosal thickening in the right maxillary sinus and the previous referred to non-clinically significant cysts (R.536). On March 30, 2000, Andrea J. Thomas, M.A., of the Epilepsy Foundation conducted a "counseling initial assessment" (R. 370-72). Plaintiff reported experiencing recurrent distressing dreams of the Gulf War and flashes of violence he did not recognize (R. 372). Ms. Thomas opined that Plaintiff had post-traumatic stress disorder and his "non-epileptic seizures very likely result from his traumatic psychological experience" (R. 372).

On February 19, 2003, Plaintiff was treated for a seizure Plaintiff reported had been brought on by

smelling perfume (R. 610).  Plaintiff reported having seizures for 12 years.  Physical examination revealed no abnormal findings and Plaintiff was discharged.

Sleep Disorders

   *Pre-DLI*

   Plaintiff has alleged a long history of sleep difficulties beginning in 1994 and including restless leg syndrome, sleep apnea and insomnia (R. 208, 240, 242, 528, 529, 596, 773-75).  He underwent sinus surgery in October 1994 (R. 208, 291).  1995 sleep studies showed decreased sleep efficiency associated with mild periodic limb movement disorder, restless leg syndrome, and poor sleep hygiene (R. 192, 227, 261-63).  On March 17, 1997, it was noted that his restless leg syndrome was "improving significantly" (R.262).

   *Post-DLI*

   Plaintiff had an abnormal sleep study on May 28, 2001 (R.526) and in January 2003 Plaintiff was evaluated for surgical intervention for sleep apnea (R. 612).  Plaintiff indicated that he had been using a CPAP machine since 2001, but was no longer able to due to oropharnygeal fullness and trauma to the uvula (R. 612). Pulmonary function tests were all within normal limits (R. 614).  Plaintiff was diagnosed with sleep apnea and was considered morbidly obese and reported smoking 1 pack of cigarettes a day (R. 612).  On March 17, 2003, Plaintiff underwent surgery to correct the oropharyngeal fullness and trauma to the uvula (R. 599).

   An August 25, 2003, sleep study showed improvement with a rapid latency to sleep, high sleep efficiency and mild periodic leg movements, but Plaintiff was still diagnosed with severe obstructive sleep apnea in October 2003 (R.604, 606).  On October 7, 2003, Plaintiff indicated that he was not using the CPAP and continued to experience sleep apnea and occasional restless leg syndrome (R. 607).  On  October 22, 2003, Plaintiff was diagnosed with continued daytime sleepiness and sleep apnea, which was much improved

(R.602).  Plaintiff found it difficult to use the CPAP and was encouraged to keep trying.

Back and Joint Pain

*Pre-DLI*

Plaintiff described low back pain, sciatica and joint pain.  An EMG study from August 1995 yielded normal results with no evidence of myopathy or neuropathy (R. 216-17).  Treatment records from 1996 and 1998 document complaints of back and joint pain (R. 266-72).  October 18, 1996, right ankle and lumbosacral x-rays revealed minimal degenerative changes (R. 289).

In May 1999, Dr. Gennaoui diagnosed degenerative joint disease (R. 312).  Plaintiff could not fully bend, but walked with a normal gait and had mild tenderness and moderate decreased range of motion in his shoulders; mild tenderness and mild decreased range of motion hands, knees and ankles (R. 311).  Dr. Gennaoui opined that Plaintiff could still stand, bend, stoop, carry, push, pull, button clothes, tie shoes, dress, dial a telephone, open doors, make a fist, pickup a pencil but not a coin, write, squat and arise from squat and climb stairs (R. 317).

*Post-DLI*

Plaintiff underwent back surgery on November 26, 2002, to correct a herniated left L4-5 disc  (R. 597).  On January 13, 2003, Plaintiff was observed to have 5/5 strength and walked without "much assistance" (R. 616).  Plaintiff reported feeling much better.

Pulmonary Impairment

Plaintiff was treated for asthma and seasonal allergies in 1995, and sinusitis in 1996 (R. 180, 191, 198-200, 248).  Spirometry performed in April 1995, August 1995 and October 1996, and chest x-rays yielded essentially normal results (R. 205, 231, 236).  A March 1999 pulmonary function study was essentially normal (R. 306).  Plaintiff continues to smoke, despite his complaints of pulmonary difficulties

(R. 239).

Mental Health

*Pre-DLI*

In 1995, Plaintiff received counseling at the Veterans Administration (VA) for adjustment disorder related to his medical problems (R. 178, 187, 210, 285-86).  On July17, 1995, Plaintiff reported social isolation, decreased attention span and increased anger and frustration as well as vivid memories of PGW combat incidents (R.187).  At a November 29, 1995, appointment Plaintiff had "no particular mental complaints" and reported that he had no depression (but was discouraged by physical problems) and, while he had memories of the Persian Gulf War (PGW), there were no particularly disturbing memories (R. 178). Plaintiff also denied any history of physical or emotional trauma, denied experiencing nightmares and related that he had only been in one fearful situation in the war, which did not result in any injuries suffered or witnessed.  On March 16,1999, Plaintiff reported to psychiatrist Dr. Dorsey that he did not have any nervous condition (R.339).  Dr. Dorsey examined Plaintiff and reported that Plaintiff was not receiving any psychiatric treatment, and assigned him a GAF rating of 90 indicative of absent or minimal symptoms (R. 339-40, 671).

*Post -DLI*

A state agency psychiatrist reviewed the medical evidence of record in October 1999, and concluded that Plaintiff did not meet or equal a listed mental or emotional impairment, but was moderately limited in his ability to sustain concentration and persistence and adapt to workplace stress (R. 156-66).

During a December15, 1999, neuropsychological assessment Plaintiff complained of experiencing 10 second blackouts twice a week since returning from the war and indicated that these episodes had increased in the last 6 months (R. 360).  He also experienced tonic-clonic seizures for the previous year, but

9

that these had occurred less frequent lately.  He reported constant chronic headaches and severe migraine headaches which lasted for days (R.361).  Darvocet "took the edge off" the headaches but did not relieve them completely.  Plaintiff reported worsening memory, concentration and word finding ability since returning from the war.  Plaintiff stated that he had flashbacks after returning from the war, but now only had flashbacks when he had a seizure (R. 361-62).  Plaintiff explained that he had received counseling 6 years ago at the VA (R. 362).  His wife reported that Plaintiff had no troubles with activities of daily living and, when feeling well, helped with cooking, cleaning and laundry and watched their daughters after school with the assistance of his sister.  Test results revealed high average intelligence and overall attention functioning, language functioning, memory and tactile functioning within normal limits (R. 363).  Plaintiff exhibited superior mental shifting and average higher level abstract thinking (R. 364).  Plaintiff's motor speed was moderate and his Personality Assessment, which showed a tendency to exaggerate symptoms, indicated emotional distress – concerns over physical health, depressive symptoms, rapid and extreme mood swings and anger problems.   The evaluator, Bradley J. Huford, M.S., recommended psychiatric medication evaluation and intensive psychotherapy (R. 365).

Plaintiff was seen by counselor Ms. Thomas on March 30, 2000, and reported recurrent distressing dreams of the war and flashes of violence he did not recognize as well as seizures with shaking and loss of consciousness 3-5 times weekly and daily staring episodes (R. 370-72).  Ms. Thomas reported the impression of dysthymia and post-traumatic stress disorder, and described Plaintiff as depressed, easily angered, and experiencing memory deficits related to stress.  Ms. Thomas opined that Plaintiff had experienced depression and memory dysfunction since 1991, and described numerous limitations of his ability to perform work-related functions (R. 392-93, 540-47).

*Appeals Council Evidence*

10

Plaintiff was evaluated on September 1, 2004, by Elaine Tripi, Ph.D., for purposes of evaluating psychosocial functioning and employability (R. 667-674) at the request of Plaintiff's counsel (Dkt.# 19, p.26). This report was submitted to the Appeals Council with Plaintiff's counsel's memorandum dated February 25, 2005 (R. 618-76).

Plaintiff reported experiencing "daily intermittent intrusive and involuntary thoughts regarding" PGW, past nightmares about his military experience and flashbacks (R. 668). He explained that he had run over and shot an Iraqi teenager that had shot at him while he was driving (R. 669). He was emotionally numb and void of feeling since his return and had difficulty trusting others. He had poor concentration, bouts of irritability and anger and an exaggerated startle response. He had 4-5 panic attacks per week. Dr.Tripi diagnosed post-traumatic stress disorder, chronic, delayed, severe and gave Plaintiff a GAF of 42, indicating serious symptoms – suicidal ideation, severe obsessive rituals  – or any serious impairment in social, occupational or school functioning (R. 669, 671). Dr. Tripi opined that Plaintiff was moderately limited in his ability to understand and remember more than one instruction or instructions with 2-3 steps or sustain an ordinary routine (R. 672). Plaintiff was markedly limited  in his ability to understand and remember complex directions, work at or nearby others without being or causing distraction. Plaintiff was extremely limited in his ability to maintain attention needed to carry out simple repetitive tasks, complete a workday without psychological interruptions, perform simple jobs at a consistent pace and perform activities within a schedule. Plaintiff was also extremely limited in his ability to accept instructions or respond to criticism; markedly limited in his ability to interact with the general public, maintain socially appropriate behavior, use good judgment and respond appropriately to changes in his work place; and moderately limited in his ability to adhere to basic standards of cleanliness, admit to or be aware of problems and ask for assistance and be aware of normal hazards (R. 673). Yet, he was able to manage funds to ensure his family's basic needs were

met.  Dr. Tripi inferred an onset date of 1994.

### 3. *Vocational Evidence*

Asah Brown served as the vocational expert (VE) in this matter (R. 790).  VE Brown characterized Plaintiff's past work as an army mechanic and shop foreman as skilled and heavy exertional and his work as a handyman as semi-skilled and medium exertional (R. 790).  Plaintiff had skills that were transferable to mechanical repair, inspection and assembly (R. 791).

VE Brown testified that Plaintiff could not perform his past work nor any competitive employment if all of described limitations were taken as accurate.  He felt that Plaintiff's testimony regarding grand mal seizures occurring 3-4 times per week and absent seizures 6-8 times per week would be preclusive of employment (R. 792).  Migraine headaches lasting 3 weeks and constant presence of "some form" of headache was also preclusive, as was chronic fatigue characterized by spontaneous sleeping 2-3 times per week, and, separately, Plaintiff's depression symptoms and personal hygiene issues.

ALJ Wilenkin posed the following hypothetical to VE Brown: an individual of Plaintiff's age, education and past work experience, with the following residual functional capacity:  stand or walk 6 of 8 hours in a work day, sit 2 of 8 hours in a work day, lift 20 pounds occasionally and 10 pounds frequently, assume "the presence of what is described by the claimant and to a lesser extent in the record, as some sort of seizure disorder generalized, partial – partial simple, partial complex, it really is unclear.  Nevertheless, you may assume the presence of a seizure activity at a frequency considerably less than that described this morning.  You may assume that in respect of this diagnosis, a certain obvious precautions would be required", no driving automobiles or automotive type equipment, no working at unprotected heights, no working with or in immediate proximity to large inherently dangerous moving machinery, no handling or manipulating or being held accountable for inherently dangerous instrumentality ( i.e., dynamite or

fissionable materials), "assume the presence of headache, metamorphous problem, one that for purposes of this inquiry, does not exist with that degree of severity, intensity or frequency, that would be incompatible with functioning of the level I suggested or functioning on a sustained, competitive basis", regarding sleep apnea "you may assume that the appropriate and regular use of the C-pap is a sufficient palliative to control lingering subsequent diurnal symptoms, such that they would not be incompatible with functioning in a vocational environment",  no work where the "pace is dictated by some external source over which he has no control.  In short he is to be allowed to work essentially at his own pace.  And in so doing, he is able to maintain daily production requirements and productivity", minimum contact with supervisors and coworkers and work that is simple, routine, repetitive with 1-3 step functions (R. 792-95).

VE Brown testified that such a person could not perform Plaintiff's past work and the memory deficit described would negate the transferability of skills (R. 795).  VE Brown testified that the following unskilled light jobs were available that the hypothetical person could perform: 4,000 custodial positions and 6,000 in industrial bench work (R. 795-96).

### 4.   *The ALJ's Decision*

ALJ Brown found that Plaintiff met the disability insured requirements of the Act through the June 30, 1999, and that he had not engaged in substantial gainful activity since the alleged onset of disability, July 31, 1992 (R. 32).

Plaintiff had a history of "sleep apnea, general and partial seizure disorder, back pain, headaches, post traumatic stress disorder, anxiety and depression", but did not have an impairment or combination of impairments that met or equalled the requirements of any impairment listed in Appendix 1, Subpart P, Part 404 (the "Listing").

ALJ Wilenkin found Plaintiff's allegations of pain and dysfunction not credible and inconsistent with

the evidence of record (R. 32), specifically finding:

– There was no evidence that petit mal, psychomotor, or focal seizures were documented by EEG prior to Plaintiff's DLI.  And, although there was evidence or a "possible generalized partial simple or complex seizure disorder", there was no evidence that Plaintiff could not work with limitations for driving and working around dangerous machinery, instrumentation, or unprotected heights (R. 26).

– Plaintiff's testified regarding low back pain and sciatica, but evidence during the relevant time period included a normal EMG, which showed no myopathy or neuropathy.  Plaintiff was diagnosed with degenerative joint disease, but had only mild tenderness and moderate decreased range of motion in May 1999.  There was no cause for hand pain in August 1999, no significant neurological deficits and only minimal degenerative arthritis of the joints and spine and - and this was beyond Plaintiff's DLI.

– Surgical intervention for Plaintiff's herniated disc in November 2002 had been advocatious

– Plaintiff testified regarding constant headaches with varied severity 3 times per week.  A disability for migraine headaches was considered neurologically minimal in October 1992, with treatment for tension headaches in July 1994.  In July 1994 Plaintiff was hospitalized with intractable headaches, sensitivity to light, and reduced motor coordination, but a sensory examination was inconsistent.  In November 1994 he took no medication for headaches, although he had in 1992 and 2002.  Common migraines were noted from July 1995 through June 1996.  A June 2001 CAT scan was essentially negative.  There is no evidence that claimant had headaches during the relevant time period in question to the degree of severity, intensity or frequency which would have been incompatible with functioning at a sustained competitive basis (R. 27).

– Plaintiff was treated for asthma and seasonal allergies in May 1995, mild hypoxemia in September 1995 and sinusitis in May 1996.  Plaintiff felt he was disabled since a Gulf War exposure to chemical toxins, but a October 1996 spirometry was normal, chest x-rays were essentially negative, and a  May 1999

14

pulmonary function study was essentially normal (with decreased FVC and FEV1 due to suboptimal effort). A March 1999 spirometry showed comparatively decreased FVC and FEV1 from the 1996 test.[1]  Dr. Gennaoui, in May 19999, noted poor lung expansion, prolonged expiratory phase but no rales, rhonci or wheezing.  Complaints of shortness of breath were not corroborated by normal pulmonary function test in August 1999 and May 2004.  No asthma was corroborated by January 2003 testing.  There was inconsistent evidence that Plaintiff smoked from 1/2-3 packs of cigarettes per day.  There was no evidence of asthma attacks, despite prescribed treatment, which required medical intervention of such a frequency as to preclude substantial gainful employment during the relevant time period.

> – While Plaintiff's sleep apnea, general and partial seizure disorder, back pain and headaches prior to his date last insured, were undoutedly diconcerting, the record does not establish limitations that would have precluded all substantial gainful activity. The claimant receive dlimited and conservative treatment for pain prior to his date last insured and not the type of medical treatment one would expect of a disabled individual.  The objective record does not show that he recieved regular physical therapy or pain clinic treatments nor did he use any ambulatory aid, brace, TENS unit, analgesic ointment, ice or heat for the relief of pain.

(R. 28).

> – Claimant's depression and post-traumatic stress disorder were not well-recorded until a March 2000

assessment, which was well beyond Plaintiff's DLI (R. 29).  Based on the record as a whole ALJ Wilenkin found that there was no objective evidence to substantiate the degree of functional limitations alleged prior to June 30, 1999 (R. 30).  He found that Plaintiff was mildly limited in activities of daily living and social functioning and had  moderate deficiencies in concentration and no episodes of decompensation.

> – The claimant's contention that his impairments prevented him from working was not supported by the objective medial evidence in this case.  At the oral hearing, the claimant responded appropriately and was healthy and large in appearance.  His memory and concentration were adequate.  His extremity usage was unimpaired, and he displayed no outward indications of pain or discomfort.  He was pleasant a the

---

[1]The record showed it was still essentially normal (R. 306).

> hearing and did not appear to have any observable physical abnormalities.  The
> claimant did not stand during the course of the oral hearing.  After considering the
> record in its entirety, the undersigned finds that the claimant's testimony as to an
> inability to perform sustained work activity because of his symptoms during the
> relevant time period in question was exaggerated, vague, and contrived and was not
> credible.

(R. 30).

ALJ Wilenkin concluded that Plaintiff had the RFC to

> perform the exertional and non-exertional requirements of work involving sitting 6 of 8 hours
> and standing or walking 2 of 8 hours in a typical work day and lifting and/or carrying up to
> 20 pounds occasionally and 10 pounds frequently and not involving driving or working
> around dangerous moving machinery, instrumentation, or unprotected heights, or performing
> work where the pace is dictated by an external source over which he has no control but could
> work at his own pace to maintain daily production requirements with contact with
> supervisors, personnel, and coworkers kept to a minimum, and involving simple routine
> repetitive one, two or three step instructions.

(R. 32).

Plaintiff was unable to perform his past relevant work and had no vocational skills that were

transferable to skilled  or semiskilled work functions of other work (R. 32-33).

Using the Medical-Vocational Guidelines as a framework, together with the testimony of the VE, the

ALJ determined that Plaintiff could perform a significant number of jobs in the economy referring to the

limited number of light jobs identified by the VE, and Plaintiff was, therefore, not disabled (R. 33).


II.   ANALYSIS

A.   **Standards Of Review**

In adopting federal court review of Social Security administrative decisions, Congress limited the

scope of review to a determination of whether the Commissioner's decision is supported by substantial

evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th

Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[2] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

**B.   Factual Analysis**

Plaintiff raises the following challenges to the Commissioner's decision: (1) the ALJ erred in determining that the medical evidence did not support a finding of disability and neglecting to address Plaintiff's restless leg syndrome and Gulf War syndrome; (2) the ALJ did not apply the proper standard in analyzing Plaintiff's subjective complaints; (3) the ALJ erred in formulating Plaintiff's RFC without giving weight to the mental health professionals that evaluated Plaintiff after his DLI where the opinions indicated long standing "problems"; (4) the hypothetical question posed to the VE was improper because it did not

---

[2] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

include non-exertional limitations indicated by the opinions of Dr. Israel and Ms. Thomas; and (5) Plaintiff is entitled to a remand pursuant to Sentence Six of 42 U.S.C. 405 for consideration of Dr. Tripi's opinion.

### 1.   *Medical Records and Credibility*

As stated above, the court's review of Social Security administrative decisions is limited in scope to a determination of whether the Commissioner's decision is supported by substantial evidence, which is defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See 42 U.S.C. § 405(g); *Sherrill, supra*, 757 F.2d at 804 (6th Cir. 1985); *Richardson, supra,* 402 U.S. at 401 (1971). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen, supra*, 800 F.2d at 545 (6th Cir. 1986). Generally, the court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner even if it finds that the evidence "preponderates against the Commissioner's decision." *Crisp v. Secretary of Health and Human Services*, 790 F.2d 450 (6th Cir.1986).

Commissioner's regulation 20 C.F.R. 404.1545 requires consideration of all medical and non-medical evidence, including the claimant's subjective accounts of symptoms, in determining RFC. Yet, subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence (20 C.F.R. 404.1529(a))." *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (6th Cir. 1986). While the issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion when making a determination of disability, *(Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003)), there are limits on the extent to which an ALJ can rely on "lack of objective evidence" in discounting a claimant's testimony.

Subjective complaints of a claimant can support a claim for disability, if there is also objective

18

medical evidence of an underlying medical condition in the record that would explain such pain.  *See Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan, supra,* 801 F.2d at 852.  While the underlying condition must have an objective basis, neither the Social Security Act nor the regulations require a claimant to prove the degree of pain and limitations by objective medical evidence. Thus, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain.  Section 404.1529(c)(2);[3] *see also, Duncan, supra,* 801 F.2d at 853. *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir. 1986); *Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir. 1991) (*en banc*); *Benson v. Heckler,* 780 F.2d 16, 17 (8th Cir. 1985); *Halpin v. Shalala,* 999 F.2d 342, 346 (8th Cir. 1993).

*Mickles v. Shalala,* 29 F.3d 918, 921 (4th Cir. 1994), made it clear that  "[t]here is no practical difference between requiring a claimant to prove pain through objective evidence and rejecting her subjective evidence because it is not corroborated by objective evidence."

If the ALJ rejects a claim of pain, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons.  S.S.R. 96-7p directs that with respect to findings on credibility they cannot be general and conclusory findings but rather must be specific.  The ALJ must say more than that the testimony on pain is not credible.  *Felisky v. Bowen,* 35 F.3d 1027, 1039 (6th Cir. 1994).  "The SSA regulations clearly state that this is not the end of the analysis. 20 C.F.R. § 404.1529(c)(2)." *Id.*  The ALJ

---

[3]  29 C.F.R. § 404.1529(c)(2) states:
> We will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

must also consider the claimant's daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage effectiveness and side effects of medication; treatment other than medication; and any other measures taken to relieve pain. *Id.* at 1039-1040.

Here Plaintiff argues that ALJ Wilenkin did not have support for finding that the clinical evidence failed to indicate a condition resulting in disabling limitations that would preclude light work. Plaintiff goes on to point to the fact that he has reported many impairments to his treators since his return from the Gulf War. Yet, the record shows that ALJ Wilenkin considered the objective medical evidence, Plaintiff's daily activities, his failure to quit smoking, medication effects and side effects and the lack of aggressive treatment in determining that the extent of Plaintiff's subjective complaints were not "fully credible".

Plaintiff had the burden of providing objective evidence confirming the severity of the alleged pain, or establishing that the medical condition is of such a kind and severity that it could reasonably be expected to produce the allegedly disabling pain. *Duncan*, 801 F.2d at 853 (6th Cir. 1986), notes "First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *See also, McCormick v. Secretary*, 861 F.2d 998, 1002-1003 (6th Cir. 1988); 20 C.F.R. § 404.1512 and 416.913(e)(requiring claimants to provide all medical evidence in support of their claims).

Here, migraines, to the extent and frequency of which Plaintiff complains, are not supported by objective and clinical diagnostic evidence. MRIs, CAT scans and EEGs were all normal. Instead, Plaintiff asks the court to rely on his "consistent"reporting of these impairments to his treators. Yet, notwithstanding the fact that Plaintiff was not entirely consistent in reporting the frequency of his migraines, the Sixth

Circuit has held that subjective complaints of migraine pain during physician visits will not relieve a claimant from the burden of producing objective evidence of migraines:

> In the case at bar, the district court correctly relied upon our reasoning in *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998 (6th Cir.1988). In *McCormick,* we determined that the claimant failed to introduce objective medical evidence to support the existence or severity of alleged migraine headaches. Like the instant case, the claimant in *McCormick* submitted evidence of diagnostic sessions with a physician, during which headache pain was discussed and treated. However, we did not find that McCormick's subjective complaints of pain during the physician visits, or the eventual diagnosis of claimant's condition, were credible enough to rise to the level of "objective medical evidence."
> We find that Long has failed to distinguish her situation from that of *McCormick.* In both cases, a diagnosis of migraine headaches was made, and the headaches were noted to occur as often as several times a week. Additionally, brain scans and EEG exams were normal in both cases. Most importantly, however, the lack of objective evidence substantiating the alleged disabling headaches is what precludes the allowance of disability benefits in these two situations. Accordingly, we hold that the district court properly found that Long did not introduce sufficient objective evidence to support the existence or severity of her allegedly disabling headaches.

*Long v. Commissioner of Social Sec.* 56 Fed. Appx. 213, 214, 2003 WL 42061, *1 (6th Cir. 2003).

Similarly, Plaintiff has presented no objective evidence regarding the nature and severity of his seizures during the relevant time period, which he testified occurred 2-3 times weekly (R. 767-69). The EEGs, MRIs and CAT scan of Plaintiff's brain detected no disease or deformity of the brain nor epileptic activity. Plaintiff's DLI was June 30, 1999 (R. 24). Prior to this date the medical records indicate that he reported seizure activity to his treators on two occasions; (1.) November 12, 1998, when Plaintiff complained of experiencing *possible* seizures, and was unwilling to reduce his restless leg syndrome medicine to determine if over-medication was responsible (R. 264) and (2.) April 21,1999, when Plaintiff was treated subsequent to reporting an episode of 2 seizures (R. 333). In May 1999, Plaintiff reported a history of petit mal and grand mal seizures occurring every few days for 8 years to Dr. Gennaoui, a Michigan Department of Disability Services (DDS) consultant (R. 309).

1999 and 2000 treatment notes describe complaints of seizures, but EEG testing performed in May

and November 1999 yielded essentially normal results (R. 319, 327-33, 367-69, 378), including a November 30, 1999 eight hour EEG study (R. 378).

During a December 15, 1999, neuropsychological assessment at Henry Ford Behavioral Health Plaintiff reported that he had been experiencing seizures for 1 year, and further reported a decrease in seizure activity with staring type episodes happening twice weekly (R. 363). On January 24, 2000, Plaintiff reported to Dr. Gregory Barkley that he experienced seizures 3-5 times per week and staring episodes multiple times each day (R.374, 375). A March 13, 2000, brain MRI was essentially negative but for mucosal thickening in the right maxillary sinus and the previous referred to non-clinically significant cysts (R.536). On March 30, 2000, Andrea J. Thomas, M.A., of the Epilepsy Foundation conducted a "counseling initial assessment" (R. 370-72). Plaintiff reported experiencing recurrent distressing dreams of the Gulf War and flashes of violence he did not recognize (R. 372). Ms. Thomas opined that Plaintiff had post-traumatic stress disorder and his "non-epileptic seizures very likely result from his traumatic psychological experience" (R. 372). On February19, 2003, Plaintiff was treated for a seizure Plaintiff reported had been brought on by smelling perfume (R. 610). Plaintiff reported having seizures for 12 years. Physical examination revealed no abnormal findings and Plaintiff was discharged.

Despite the inconsistent reporting regarding the onset and frequency of his seizures and the lack of objective evidence, ALJ Wilenkin did not find that Plaintiff did not suffer from seizures, only that his testimony regarding their frequency (6 times weekly in 1999 and 2-3 times weekly at the time of the hearing) and their severity were not credible. The reporting inconsistencies noted above and lack of any reports of actual seizures prior to April 1999 are substantial evidence to support this finding regarding insufficient proof of frequent severe seizures. ALJ Wilenkin provided for the existence of fewer and less severe seizures by including the typical seizure precautions in Plaintiff's RFC, which was used in is

22

hypothetical question.          Plaintiff's restless leg syndrome and sleep and pulmonary problems are better documented.  Yet, subsequent to his abnormal 1995 sleep studies – showing decreased sleep efficiency associated with mild periodic limb movement disorder, restless leg syndrome, and poor sleep hygiene (R. 192, 227, 261-63) –  it was noted on March 17, 1997, that his restless leg syndrome was "improving significantly" (R.262).  All  Plaintiff's pulmonary tests were within normal limits.  Spirometry performed in April 1995 and October 1996, and chest x-rays yielded normal results (R. 205, 231, 236); a March 1999 pulmonary function study was essentially normal (R. 306).  Further, Plaintiff admittedly continues to smoke, despite his complaints of pulmonary difficulties (R. 239).

The next record of Plaintiff receiving treatment for sleep problems is in May, 2001, after his DLI (R. 527, 529), when he had another abnormal sleep study (R.526) and January 2003 when he underwent surgical intervention for sleep apnea (R. 612).  As Plaintiff points out, there is frequent mention of daytime sleepiness in the pre-1997 records and the post-DLI  records.  Yet, ALJ Wilenkin's finding that there was no record of post-therapeutic problems causing "overwhelming chronic or easy fatigability or daytime somnolence" and "no indication of sleep apnea of such a severity as to preclude substantial gainful activity prior to June 30, 1999" is supported by substantial evidence in the record.

Plaintiff's argument that ALJ Wilenkin failed to take into account a diagnosis of Gulf War syndrome is not supported by the record.  ALJ Wilenkin analyzed each symptom testified to by Plaintiff and/or contained in the medical records.  The fact that he did not term the symptoms collectively to be Gulf War Syndrome is of little consequence.  The symptoms would not be more severe and debilitating if they were termed Gulf War syndrome then they are when considered individually.  Further, a perusal of current case law does not indicate that Gulf War syndrome is considered a condition for which objective medical evidence is unavailable and reliance on purely subjective evidence is therefore allowed – like fibromyalgia.

Plaintiff's allegation of severe mental limitations during the relevant period also lacks support.   The record indicates that Plaintiff received some adjustment counseling when he returned from the Gulf War and then required more intensive therapy and medication post-DLI when his symptoms escalated.  Plaintiff argues that the post-DLI mental health treators' opinions support a finding that Plaintiff was disabled pre-DLI because they opine that his mental health problem is long-term.  Yet, Plaintiff reported more severe symptoms to his post-DLI treators than he had pre-DLI.

At a November 29, 1995, appointment Plaintiff had "no particular mental complaints" and reported that he had no depression (but was discouraged by physical problems) and, while he had memories of the Gulf War, there were no particularly disturbing memories (R. 178).  Plaintiff also denied any history of physical or emotional trauma, denied experiencing nightmares and related that he had only been in one fearful situation in the war which did not result in any injuries suffered or witnessed.  On March 16, 1999, Plaintiff reported to psychiatrist, Dr. Dorsey, that he did not have any nervous condition (R.339).  Dr. Dorsey examined Plaintiff and reported that Plaintiff was not receiving any psychiatric treatment, and assigned him a GAF rating of 90 indicative of absent or minimal symptoms (R. 339-40, 671).  A state agency psychiatrist reviewed the medical evidence of record in October 1999, and concluded that Plaintiff did not meet or equal a listed mental or emotional impairment, but was moderately limited in his ability to sustain concentration and persistence and adapt to workplace stress (R. 156-66).  Yet, post-DLI Plaintiff complained of experiencing 10 second blackouts twice a week since returning from the war and indicated that these episodes had  increased in the last 6 months (R. 360).  He also reported worsening memory, concentration, word finding ability and flashbacks after returning from the war (though he only had flashbacks when he had a seizure at the time of reporting) (R. 360-62).  He reported recurrent distressing dreams of the war and flashes of violence he did not recognize as well as seizures with shaking and loss of

24

consciousness 3-5 times weekly and daily staring episodes (R. 370-72).

This disparity in reporting supports either a finding that Plaintiff's symptoms worsened post-DLI or his reporting was not credible.  Further, there was contrary evidence presented to the post-DLI treators. Plaintiff's wife reported to the post-DLI treators that Plaintiff had no troubles with activities of daily living and, when feeling well, helped with cooking, cleaning and laundry and watched their daughters after school with the assistance of his sister.  Post-DLI test results revealed high average intelligence and overall attention functioning, language functioning, memory and tactile functioning within normal limits (R. 363). Plaintiff exhibited superior mental shifting and average higher level abstract thinking (R. 364).  Plaintiff's motor speed was moderate and his Personality Assessment, which showed a tendency to exaggerate symptoms, indicated emotional distress – concerns over physical health, depressive symptoms, rapid and extreme mood swings and anger problems.

For these reasons, ALJ Wilenkin's finding that Plaintiff's post-DLI diagnosis of mental disability relating back to pre-DLI was not credible was supported by substantial evidence.

Similarly, Plaintiff's allegation on disabling joint and back pain is not supported by the objective medical evidence.  An EMG study from August 1995 yielded normal results with no evidence of myopathy or neuropathy (R. 216-17).  And, although treatment records from 1996 and 1998 document complaints of back and joint pain (R. 266-72), October 18, 1996, right ankle and lumbosacral x-rays revealed minimal degenerative changes (R. 289).  Plaintiff's DDS examination revealed that Plaintiff could not fully bend, but walked with a normal gait and had mild tenderness and moderate decreased range of motion in his shoulders; mild tenderness and mild decreased range of motion hands, knees and ankles (R. 311).  Dr. Gennaoui opined that Plaintiff could still stand, bend, stoop, carry, push, pull, button clothes, tie shoes, dress, dial a telephone, open doors, make a fist, pickup a pencil but not a coin, write, squat and arise from

squat and climb stairs (R. 317).  Post-DLI on November 26, 2002, Plaintiff's back pain was exacerbated and he had back surgery (R. 597).  Plaintiff reported feeling much better post-surgery and was observed on January 13, 2003, to have 5/5 strength and walking without "much assistance" (R. 616).

Thus, ALJ Wilenkin's reasons for discrediting Plaintiff's complaints of disabling pain and psychological impairments are supported by the record, as is his determination that the objective medical evidence failed to establish "the degree of functional limitations" or exertional "limitations that could have precluded all substantial gainful activity".  Therefore, it is recommended that ALJ Wilenkin's determination not be overturned.

### 2.      *The post-DLI mental health treators and Plaintiff's RFC*

In August 1991, the Social Security Administration adopted a new regulation in response to the treating physician rules adopted by the various circuits.  20 C.F.R. § 404.1527.  While the regulation indicates that the Commissioner will generally give more weight to the opinions of treating sources, it sets preconditions for doing so, which are stricter than those established by the Sixth Circuit.  The new regulation also limits the scope of the subject matters on which the Commissioner will give a treating source opinion greater weight.  Indeed, the Commissioner's use of the "treating source" as opposed to "treating physician" appears to be an effort to distinguish these new regulations from the case law established in the various circuits under the generic term of the "treating physician rule."

Under this regulation, the Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record."  20 C.F.R. § 404.1527(d).  In those situations where the Commissioner does not give the treating source opinion "controlling weight," the regulations set out five criteria for evaluating that medical opinion in conjunction with the other medical

26

evidence of record.  The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion on "the issue[s] of the nature and severity of your impairment[s]."  20 C.F.R. § 1527(d)(2).

Under 20 C.F.R. § 404.1527(e), the Commissioner will not defer to treating source opinions on certain subjects that are "reserved to the Secretary."  These include:

1.  An opinion that claimant is disabled under the "statutory definition of disability."

2.  An opinion on the nature and severity of the impairment if that opinion does not meet the "well supported" standard of § 1527(d) set out above.

3.  An opinion that the claimant meets the Listing of Impairments.

4.  An opinion on the effects of an impairment on the claimant's residual functional or vocational capacity.

Thus, while deferring in part to the court-created "treating physician rule," the Commissioner's 1991 regulation in large measure rejects circuit case law that gives enhanced weight to treating physician opinions regarding disability under the Listing or on residual functional capacity.

While 20 C.F.R. § 404.1527(a) defines medical opinions to include statements from physicians as to what an individual "can still do despite impairment(s), and [a claimant's] physical or mental restrictions," these factors are different than the issues reserved to the Commissioner, including the individual's residual functional capacity and whether the person can perform other work in the economy and is thus not disabled. See SSR 96-5p and 20 C.F.R.§§ 404.1527(e) and 429.927(e).

SSR 96-5p notes this difference with regard to residual functional capacity determinations which include the individual's ability to perform work-related activities based on both medical and non-medical evidence.  It points out that the ALJ often has more substantial additional evidence available in making this

27

determination than does a treating source.  While the ALJ must consider the opinion of claimant's treating source as to what the claimant can still do, the judgment as to whether claimant has the residual functional capacity for other work involves considerations beyond that medical judgment as to what the individual can still do and is a determination to be made by the ALJ.  Furthermore, the ALJ in making that determination is only bound by the treating source's opinion on what the individual can do when that opinion meets the standards set out in 20 C.F.R. § 404.1527(d)(2).  As noted above, that regulation and SSR 96-2p give controlling weight to a treating source opinion only when that opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent" with other substantial evidence in the record.

Plaintiff argues that the Appeals Council mandated that ALJ Wilenkin address the opinions of post-DLI treators, Andrea Thomas, M.A., Dr. Kenneth Israel and Dr. George Barkley in determining his RFC (Dkt. #19, p. 22).  Yet the Appeals Council order actually required the ALJ to determine "when and where Andrea Thomas and Dr. Israel treated Plaintiff in order to ascertain whether they may have treated him during his "long history of treatment" at the VA, because it was believed that Dr. Barkely was associated with the VA and Dr. Barkley had signed off on one of Ms. Thomas' reports (Appeals Council Order, R. 581; Report signed by Dr. Barkley, R. 545).  Plaintiff does not allege that these treators were part of a longer history of treatment than their records indicate.  In fact, it appears that Dr. Israel not a treating or even evaluating source.  He simply signed off on another of Ms. Thomas' reports (R. 393).

With respect to Ms. Thomas, ALJ Wilenkin determined that her opinion could not be given controlling weight because (a.) she had not provided specific limitations for consideration, nor provided sufficient clinical or laboratory findings to support her opinion and (b.) her opinion was contradicted by the longitudinal evidence from the VA, Plaintiffs limited and conservative medical treatment and his activities

28

of daily living (R. 29-30).  Therefore, ALJ Wilenkin properly discounted her opinion and determined that her post-DLI analysis did not provide information pertinent to the relevant time, pre-DLI.

For the same reasons, the post-DLI opinions of Dr. Barkley and Bradley J. Hufford, M.S. (as approved by Dr. Anne Baird) do not establish a pre-DLI condition and ALJ Wilenkin's failure to include these opinions in formulating Plaintiff's pre-DLI RFC is supported by the record.

This conclusion also answers Plaintiff's argument that the RFC posited to the VE was improper because it did not include the non-exertional limitations documented by Ms. Thomas.

### *3.* *"Sentence Six" Remand*

Plaintiff argues that a "Sentence Six" remand is appropriate for consideration of Dr. Tripi's opinion.

Evidence submitted to the Appeals Council after an ALJ's decision cannot be considered part of the record for purposes of substantial evidence review.  *Cline v. Comm'r of Social Sec.,* 96 F.3d 146, 148 (6th Cir.1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision.").  "The district court can, however, remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Id.*

For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was "not in existence or available to the claimant at the time of the administrative proceeding."  *Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990).  Such evidence is "material" only if there is a reasonable possibility that the Commissioner would have reached a different disposition of the disability claim if presented with the new evidence.

*Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981).[4]   A claimant shows "good cause" by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ.  *Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551, 554 (1984) (per curiam).  The burden of showing that a remand is appropriate is on the claimant.  *Oliver v. Sec'y of Health & Human Servs.,* 804 F.2d 964, 966 (6th Cir.1986).

Dr. Tripi's January 2005 opinion was solicited by Plaintiff's counsel in response to ALJ Wilenkin's denial of Plaintiff's claim (Dkt. #19, p. 26).  This situation does not meet the burden of "good cause" for failure to submit evidence during the prior proceedings.  Plaintiff's original application for benefits was filed in February 1999, he received unfavorable decisions after administrative hearings in September 2000 and June 2002 and the matter was remanded for the hearing at issue by a February 2003 order (Dkt. #19, p. 5). At any time prior to this third hearing, and even subsequently if requested, Plaintiff could have supplemented his medical records with a mental health consultation from Dr. Tripi.

Furthermore, Dr. Tripi's opinion does not substantially add to the other mental health opinions.  In fact, Plaintiff reported even more severe symptoms to Dr. Tripi than he had in the past – "daily intermittent

---

[4]Defendant may argue that *Sizemore v. Sec'y Health & Human Servs.*, 865 F.2d 709 (6th Cir. 1988) is controlling for the proposition that Plaintiff must show that there is a reasonable *probability* that the Secretary would reach a different result with the new evidence, as opposed to a reasonable *possibility*.

In *Sizemore v. Secretary*, 865 F.2d 709, 711 (6th Cir. 1988), the Sixth Circuit discusses the materiality standard of § 405(g) and determines that claimants must "demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence" in order to meet the materiality burden.  865 F.2d at 711(citations omitted).  Yet, it is clear from reading *Sizemore* that the issue of the  definition of "materiality" was not before the Sixth Circuit in that case.  It also appears that the Sixth Circuit in *Sizemore* misstates the actual law in this and other circuits.  None of the cases that it cites support the proposition that the materiality standard requires that there must be a "reasonable probability" of a different outcome. The case law focusing on this specific issue makes it clear that a lower standard of "reasonable possibility," and not "reasonable probability" applies for considering the materiality standard under 42 U.S.C. § 405(g).  *See Chaney, supra,* 659 F.2d 676, 679 ("Thus we hold that a remand to the Secretary is not justified if there is no reasonable possibility that it would have changed the outcome of the Secretary's determination."); *Godsey v. Bowen,* 832 F.2d 443, 444 (7th Cir. 1987); *Hyde v. Bowen,* 823 F.2d 456, 459 (11th Cir. 1987); *Milano v. Bowen,* 809 F.2d 763, 766 (11th Cir. 1987); *Booz v. Secretary*, 734 F.2d 1378, 1380-81 (9th Cir. 1984); *Dorsey v. Heckler,* 702 F.2d 597 (5th Cir. 1983).

intrusive and involuntary thoughts regarding" the war, past nightmares about his military experience and flashbacks – and relayed for the first time a disturbing story of being forced to run over with a car and then shoot to death an Iraqi teenager that had shot at Plaintiff.  Pre-DLI, Plaintiff denied any history of physical or emotional trauma, denied experiencing nightmares and related that he had only been in one fearful situation in the war which did not result in any injuries suffered or witnessed (R. 178).  This would seem to indicate either that Plaintiff's symptoms have worsened post-DLI and he is uncovering new memories, or Plaintiff was trying to increase the chances of a favorable diagnosis.  Either way, there is no reasonable possibility that the Commissioner would have reached a different disposition of the disability claim if presented with Dr. Tripi's opinion, as it is still contradicted by the longitudinal evidence from the VA regarding Plaintiff's mental health status pre-DLI.

In sum, Dr. Tripi's opinion is not material and thus Plaintiff's request for a Sentence Six remand should be denied.


## III.   RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED.  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and

Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: June 30, 2006                                    s/Steven D. Pepe
Ann Arbor, Michigan                                   United States Magistrate Judge

<u>Certificate of Service</u>

I hereby certify that a copy of this Report and Recommendation was served upon the attorneys of record by electronic means on June 30, 2006.

s/William Barkholz
Deputy Clerk